**AFFIDAVIT IN SUPPORT OF APPLICATION FOR CRIMINAL COMPLAINT**

I, James Picardi, being duly sworn, state the following:

**<u>Introduction</u>**

1.      I am a "federal law enforcement officer" within the meaning of Federal Rule of Criminal Procedure 41(a)(2)(C), that is, a government agent engaged in enforcing the criminal laws and duly authorized by the Attorney General to request a search warrant.  I am also an "investigative or law enforcement officer" within the meaning of 18 U.S.C. § 2510(7); that is, an officer of the United States empowered by law to conduct investigations of, and to make arrests for, offenses enumerated in 18 U.S.C. § 2516.

2.      I have been employed as a Task Force Officer of the United States Drug Enforcement Administration ("DEA") since 2002. I am currently assigned to the Boston Office of the New England Field Division. I have served as a police officer in Revere, Massachusetts, since 1991. I was promoted to the rank of Sergeant in 1996 and served as a narcotics detective for four years. In September 2002, I was sworn in as Task Force Officer and began working with the DEA on that date through the present date.

3.      As a Task Force Officer of the DEA, I am authorized to investigate violations of the laws of the United States, including violations of the federal drugs laws in Title 21 of the United States Code. I am an investigative or law enforcement officer of the United States, within the meaning of Section 2510(7) of Title 18, United States Code, and am empowered by law to conduct investigations of and to make arrests for offenses enumerated in Section 2516 of Title 18, United States Code. I am also a "federal law enforcement officer" within the meaning of Federal Rule of Criminal Procedure 41(a)(2)(C), that is, a government agent engaged in

enforcing the criminal laws and duly authorized by the Attorney General to request search warrants.

4.     I have participated in all aspects of drug investigations, including physical surveillance, surveillance of undercover transactions, the introduction of undercover agents and cooperating sources, the execution of search warrants, the effecting of arrests, and debriefings of defendants, informants and witnesses who had personal knowledge regarding major narcotics trafficking organizations.  I am familiar with the benefits and limitations of these techniques.   I have also reviewed recorded conversations and telephone, financial, and drug records.  Through my training and experience, I have become familiar with the manner in which illegal drugs are imported, transported, stored, and distributed, and the methods of payment for such drugs.  I have also become familiar with the manner in which narcotics organizations use various forms of violence and intimidation in furtherance of their narcotics trafficking activity, to protect their operations, members, narcotics, and narcotics proceeds.

5.     By virtue of my employment as a police officer and assignment as a DEA Task Force Officer, I have performed and continue to perform various duties, including, but not limited to: working in the capacity of a surveillance agent detecting and recording movement of persons known to be or suspected of being involved in illegal drug trafficking; working as a case agent directing the investigation of various illegal drug traffickers and their organizations; and directing investigations involving complex conspiracies.

6.     Through experience and training, I have become familiar with the types and amounts of profits made by drug traffickers and the methods, language, and terms used to disguise illegal activity.  I know that persons engaged in drug trafficking require expedient forms of communication to maintain an adequate and consistent supply of drugs from sources, and to

effectively market those drugs to customers.   I understand illegal drug trafficking often involves the local, interstate, and international movement of illegal drugs to distributors and co-conspirators at multiple levels, and the movement of the proceeds of drug trafficking among multiple participants including suppliers, customers, distributors and money launderers.

7.     I am familiar with narcotics traffickers' methods of operation, including methods used by them to distribute, store, and transport narcotics and to collect, expend, account for, transport, and launder drug proceeds.  I am familiar with the manner in which drug traffickers use telephones, coded or slang-filled telephone conversations, text messages, communication apps, and other means to facilitate their illegal activities.

8.     Based on my training and experience, I believe that illegal drugs and drug proceeds are often transported in motor vehicles and that drug traffickers often coordinate such transportation through the use of cellular telephones. Through my training and experience, I have acquired specialized knowledge in the activities of drug traffickers, including their use of residences, businesses, and drug "stash houses," to store and process drugs for distribution and to direct their drug distribution activities. That training and experience has led me to believe that drug traffickers store contraband, as well as other evidence of their crimes such as drug proceeds, cellular telephones, cuff sheets or owe sheets, at their residences, businesses, and stash houses.

**Purposes of Affidavit**

9.     I submit this affidavit in support of the following:

    a.   An application for a criminal complaint for John DOE a.k.a. an individual with the initials L.M. with Date of Birth xx/xx/1975 and SSN: xx/xx/5479 for a violation of 21 U.S.C. § 841 (possess with intent to distribute 10 grams or more of a fentanyl analog) (the "Target Subject" and the "Target Offense");

b. An application for a search warrant to search the Target Subject. The Target Subject is more specifically described in Attachment A, which is incorporated by reference.

10. Based on the facts set forth in this affidavit, there is probable cause to believe that DOE has committed the Target Offense and that evidence of the commission of the Target Offense will be located on his person.

11. I am a Task Force Officer and have conducted this investigation working closely with other DEA Special Agents and law enforcement personnel. Accordingly, I am familiar with the facts concerning this investigation. The facts in this affidavit come from my personal observations, my training and experience, and information obtained from other agents and witnesses. This affidavit is intended to show that there is probable cause for the criminal complaint and search warrants and does not set forth all of my knowledge about this matter.

## Probable Cause

12. Since March 2021, the DEA has been investigating DOE, a suspected narcotics trafficker located in Massachusetts. Investigators initially received information about DOE's activities from a Confidential Source ("CS").[1] CS stated that he/she knew DOE to be a source of supply for fentanyl and met with him in Dorchester, Massachusetts on or about March 6, 2021. During that meeting, which occurred before CS began cooperating and was unrecorded,[2] DOE offered to sell CS fentanyl for $50-$55 per gram. DOE stated that the quality of the fentanyl is

---

[1] CS has a conviction for drug trafficking and was sentenced to a term of imprisonment. CS has remained released on conditions pending sentencing. CS is cooperating with law enforcement partially in the hopes of receiving a reduction in his sentence but primarily for immigration benefits. Based on the investigation so far and a review of the recordings made so far, CS is believed to be reliable.

[2] CS met with DOE in the hopes of procuring information that could be provided to the government. This meeting was likely a violation of the terms of CS's pre-sentencing release.

excellent because he has a family member in Mexico from whom he obtains the fentanyl.  DOE told CS that he only deals in fentanyl because he can make a lot of money with it and there is no profit dealing with cocaine.  DOE stated that CS could be a 100-150 gram customer.  DOE also stated that he has been selling drugs for over ten years and has had to change the way he operates as a result of a past arrest.  Specifically, DOE now supplies fake drugs to his customers periodically to see if they complain about the quality of his product.  If the customer does not complain, DOE would suspect the customer of being an informant.

13.     DOE gave CS two telephone numbers: (857) 544-0043 and (857) 318-5353.  DOE stated that the 0043 number was for business (meaning drug trafficking) and the 5353 number was his personal number.

14.     CS provided investigators with a picture of DOE.  I recognized the person as DOE from a previous arrest of DOE in which I participated.  Specifically, DOE was arrested in 2016 after delivering approximately 235 grams of heroin to an undercover trooper in Revere, Massachusetts.  A subsequent search of locations associated with DOE resulted in the seizure of an additional two kilograms of heroin and a semi-automatic handgun. One of the locations searched was 76 West Newton Street, Apartment 3, in Boston, which occurred on February 9, 2016 and documents in the name of L.M. and a photograph of DOE were seized inside.

15.     Between late March and June 9, 2021, DOE repeatedly reached out to CS to arrange for the sale of fentanyl, but CS made various excuses at the direction of investigators.  Specifically, DOE sent CS multiple messages using WhatsApp, an encrypted messaging service.

**June 9, 2021:  DOE sold the CS approximately 50 grams of suspected Fentanyl**

16.     On June 9, 2021, at approximately 10:30 a.m. investigators met with CS to arrange for the controlled purchase of narcotics from DOE.  At the direction of investigators, CS called

DOE.  Over the course of multiple conversations, which occurred both over wire communications and WhatsApp, CS and DOE agreed to meet at 3:30 p.m. at a restaurant in Lawrence to conduct the transaction.

17.    Prior to traveling to the meeting location, investigators searched CS and the vehicle CS would be driving for contraband or unexplained currency, with negative results.  Investigators also gave CS an audio/video recording device which would also transmit a live audio feed to investigators.   Investigators also provided CS with $2,500 in agency funds to complete the transaction.

18.    At approximately 4:32 p.m., surveillance near the meeting location observed DOE arrive at the restaurant in a 2020 Honda CRV, bearing Massachusetts registration 2ZN473.[3] Investigators saw that DOE was carrying a black shoulder bag.  Thereafter, investigators surveilled CS travel from the staging location to the restaurant and watched CS enter the restaurant, arriving around 4:35 p.m.

19.    According to CS, upon entering the restaurant, CS went upstairs and met with DOE. Upon sitting down at the table where DOE was eating, DOE handed CS a clear plastic baggie wrapped in green cellophane containing approximately 50 grams of suspected fentanyl.  CS then gave DOE the $2,500 in agency funds as payment.  DOE told CS that while he had paid for 50 grams, DOE actually provided CS 51 grams of fentanyl so that there would not be any dispute or complaint about the amount.  DOE also told CS that the fentanyl was a "ten" in quality, which CS understood to mean that the fentanyl was very high quality and that the CS could add ten grams of cut to every one gram of fentanyl, thus creating 500 grams to distribute.  After the exchange, CS and DOE continued talking about a variety of subjects, including drug trafficking, while DOE

---

[3] Prior to arriving, DOE sent CS multiple WhatsApp messages claiming to be stuck in traffic.

finished his meal.  Among other subjects, DOE confirmed that he has been trafficking in narcotics for ten years and discussed his prior arrest for drug trafficking.[4]

20.     At approximately 5:23 p.m., investigators saw CS leave the restaurant. Investigators surveilled CS drive to a prearranged location.  At that location, CS provided investigators with the clear plastic baggie that DOE gave to him/her at the meeting.  Investigators unwrapped the baggie and conducted a field test of the white powdery substance that was inside. The substance tested positive for the presence of butyryl fentanyl.

21.     A Spanish-speaking agent has reviewed the full recording that was made by CS of the meeting with DOE.  That recording largely corroborates the account of CS set forth above, although some of the conversation is unintelligible.

22.     On Friday, June 11, 2021, DOE sent CS a WhatsApp voice message.  Investigators have reviewed and preserved that message.  DOE told CS to delete all of the other phone numbers that he had previously given CS.  DOE told CS to use the number (347) 596-1155 in the future. DOE stated that he was going to keep the old number but only use it for friends and family.[5] DOE stated that an associate had been recently arrested so DOE had to change everything.

**June 30, 2021:  DOE sold the CS approximately 50 grams of suspected Fentanyl**

---

[4] I am aware that DOE has a criminal history in Massachusetts containing 11 arraignments dating back to 2008.  Included within those arraignments are a 2008 arrest for Distribution/Dispense Class B controlled substance and the 2016 arraignments for Trafficking in Heroin, Distribute/Dispense Class B subsequent offense, Conspiracy, and Firearm possession without an FID card. DOE was convicted in Suffolk Superior Court for 3 counts of Distribution of a Class B Substance and Possession to Distribute a Class B Substance.  He was sentenced to 4-5 years' incarceration.

[5] CS Contacted DOE on 347-506-5830 and Arranged to Purchase Fifty Grams of Fentanyl on June 9, 2021.  Two Days Later, DOE Provided CS with Target Phone 347-596-1155

23.    On June 24, 2021, United States Chief Magistrate Judge Page Kelley signed a geo-location tracking warrant for a cellphone of DOE.  On June 26, 2021, investigators began receiving geo-location data from T-Mobile.[6]  The data received indicated that DOE was located within the vicinity of the 76 West Newton Street.

24.    On June 29, 2021, CS called (347) 596-1155 at the direction of investigators and spoke with DOE.  During that conversation, which was recorded, CS and DOE agreed to meet the following day so that CS could buy an additional 50 grams of fentanyl.

25.    On June 30, 2021, at approximately 9:37 a.m., pursuant to the geo-location tracking warrant, agents received a location for DOE's cellphone in the area of 455 Blue Hill Avenue, Boston, MA.  At approximately 9:46 a.m., agents observed the Honda CRV parked in front of 471 Blue Hill Avenue.  Agents observed an unknown male wearing a blue shirt sitting in the front passengers' seat.

26.    A few minutes later, agents observed DOE, wearing a beige baseball cap, in the driver's seat of the vehicle.  A short time later, the Honda CRV departed the area.

27.    At approximately 10:08 a.m., agents observed DOE arrive at the South Station Bus Terminal, 700 Atlantic Avenue, Boston, MA.  Agents observed the front seat passenger, wearing a blue shirt and black jeans, exit the vehicle with a backpack over his shoulder and enter the bus terminal.  DOE then departed the area.

28.    At approximately 10:30 a.m., agents established surveillance around the area of a restaurant in Lawrence, the site where the CS would be purchasing the 50 grams of Fentanyl from DOE.

---

[6] A second warrant for DOE's other phone number ((347) 596-1155) was not honored by T-Mobile because DOE changed the IMSI associated with his account.

29.     At approximately 10:39 a.m., agents observed DOE arrive at the restaurant in the Target Vehicle.  Agents observed DOE enter the restaurant.  DOE was carrying a black shoulder bag.

30.     At approximately 11:00 a.m., agents met with CS to arrange for the controlled purchase of narcotics from DOE.   Prior to traveling to the meeting location, investigators searched CS and the vehicle CS would be driving for contraband or unexplained currency, with negative results.  Investigators gave CS an audio/video recording device which would also transmit a live audio feed to investigators.   Investigators also provided CS with $2,500 in agency funds to complete the transaction.  Investigators then escorted the CS to the meet location where DOE was present.  Agents observed the CS enter the restaurant at approximately 11:21 a.m.

31.     According to the CS, upon entering the restaurant the CS met with DOE, who was sitting at a table. When the CS sat down, DOE handed CS a clear plastic baggie wrapped in green cellophane containing approximately 50 grams of suspected fentanyl.  CS then gave DOE the $2,500 in agency funds as payment.    From my subsequent review of the recording from audio/video recording device provided to the CS, I was able to corroborate what the CS had told investigators.

32.     At approximately 11:32 AM, investigators observed the CS and DOE exit the restaurant, enter their respective vehicles, and leave the area.

33.     Investigators surveilled CS drive to a prearranged location.  At that location, CS provided investigators with the recording device and the clear plastic baggie that DOE gave to him/her at the meeting.   Investigators unwrapped the green cellophane around the baggie and observed a large chunk of a compressed white powdery substance and conducted a field test.  The

substance tested positive for the presence of cyclopropyl fentanyl.  CS and the CS's vehicle were searched again for contraband or unexplained currency, with negative results.

34.     Law enforcement officers surveilling DOE saw him leave the restaurant and park in front of a business at the corner of Margin Street and Essex Street in Lawrence.  DOE appeared to be looking at all the vehicles going by.  Surveillance was subsequently terminated.

**July 7, 2021:  Installation of GPS tracking warrant obtained for a 2020 Honda CRV, MA registration 2ZN473 used by DOE.**

35.     On July 7, 2021, the Honorable M. Page Kelley, United States Magistrate Judge, granted the government's application for a tracking warrant that authorized, for a period of 45 days from the date of the warrant, the installation and use of a GPS tracking device to monitor and record data regarding the movement of the Honda CRV.  The tracking device was installed on July 9, 2021 while the vehicle was parked on West Newton Street in Boston.

36.     On August 20, 2021, the Honorable M. Page Kelley, United States Magistrate Judge, granted the government's application to extend authorization to monitor and record data regarding the movement of the Honda CRV until October 5, 2021.

37.     Over the course of this investigation data collected from the Honda CRV indicates the Honda CRV returns to West Newton Street in Boston on a nightly basis and remains there until it moves the following day.

**July 19, 2021:  DOE sold the CS approximately 100 grams of suspected Fentanyl**

38.     On July 14, 2021, CS called (347) 596-1155 at the direction of investigators and spoke with DOE.  During that conversation, which was recorded, CS told DOE that CS wanted to purchase up to 100 grams of fentanyl and negotiated a price of $48 per gram.  CS and DOE agreed to conduct the transaction when CS was ready.

39.     On July 19, 2021, at approximately 9:15 a.m., CS called (347) 596-1155 to arrange the fentanyl transaction with DOE.  CS told DOE that CS wanted 50 grams of fentanyl but that the amount might increase to 100 grams of fentanyl.  CS promised to call DOE back shortly.  At approximately 9:45 a.m., surveillance agents saw DOE leave an apartment building located at 76 W. Newton Street in Boston and enter the Honda CRV.  At approximately 9:49 a.m., CS called DOE again and requested that the deal be for 100 grams of fentanyl.

40.     At approximately 11:38 a.m., investigators observed DOE arrive at a restaurant in Lawrence.  This is the same restaurant where DOE and CS previously met to conduct fentanyl transactions.  Investigators observed DOE enter the restaurant.

41.     At approximately 11:40 a.m., investigators met with CS to arrange for the controlled purchase of narcotics from DOE.   Prior to traveling to the meeting location, investigators searched CS and the vehicle CS would be driving for contraband or unexplained currency, with negative results.  Investigators also gave CS an audio/video recording device which would also transmit a live audio feed to investigators.  Investigators also provided CS with $4,800 in agency funds to complete the transaction.  Investigators then escorted the CS to the meet location where DOE was present.  Investigators observed the CS enter the restaurant at approximately 12:27 p.m.

42.     According to the CS, upon entering the restaurant the CS met with DOE, who was sitting at a table. DOE told CS to go to the bathroom and place the money near the toilet paper. CS stated that once he/she placed the money in the bathroom, DOE entered the bathroom and placed the drugs, which were wrapped in green cellophane, near the toilet paper. CS stated that once DOE exited the bathroom, CS re-entered the bathroom to retrieve the drugs.  DOE then engaged in a short conversation at the table.  DOE told CS that he did the deal in the bathroom

11

because he was scared of the cameras at the restaurant.  DOE said that next time CS would not even need to talk to DOE and that CS should just go directly to the bathroom to conduct the transaction.  From my subsequent review of the recording from audio/video recording device provided to the CS, I was able to corroborate what the CS had told investigators.

43.      At approximately 1:00 p.m., investigators observed the CS and DOE exit the restaurant, enter their respective vehicles, and leave the area.

44.      Investigators surveilled CS as he/she drove to a prearranged location.  At that location, CS provided investigators with the recording device and the clear plastic baggie that DOE gave to him/her at the meeting.  Investigators unwrapped the green cellophane around the baggie and observed a large chunk of a compressed white powdery substance and conducted a field test.  The substance tested positive for the presence of cyclopropyl fentanyl.  CS and the CS's vehicle were searched again for contraband or unexplained currency, with negative results.

**August 19, 2021:  DOE sold the CS approximately 50 grams of suspected Fentanyl**

45.      On August 19, 2021, at approximately 10:35 a.m., CS called (347) 596-1155 at the direction of investigators and spoke with DOE.  During that conversation, which was recorded, CS told DOE that CS wanted to purchase 50 grams of fentanyl and asked if it could be packaged into two 25 gram packages.[7]  DOE agreed to conduct the transaction and told CS they could meet.  DOE informed CS that DOE would arrive in Lawrence in an hour.  The meeting location would be a restaurant where CS had conducted previous drug transactions with DOE.  CS remained in the presence of investigators while waiting to conduct the drug sale with DOE.   Prior to traveling to the meeting location, investigators searched CS and the vehicle CS would be driving for contraband or unexplained currency, with negative results.  Investigators gave CS an audio/video

---

[7] CS was unaware that investigators would have CS request two 25 gram bags of fentanyl before meeting with investigators.

recording device which would also transmit a live audio feed to investigators.  Investigators also provided CS with $2,500 in pre-recorded agency funds to complete the transaction.

46.        Investigators initiated surveillance of the Honda CRV where it was parked on West Newton Street in Boston.    At approximately 11:05 a.m., investigators conducting surveillance saw DOE, carrying a white plastic bag, leave an apartment building located at 76 West Newton Street in Boston and enter the Target Vehicle.  DOE remained inside his vehicle for approximately nine minutes.  During that time period, investigators observed the brake lights go on and off twice in a four minute interval.  The running lights were additionally turned on.  Based on my training and experience, these types of behaviors and actions are consistent with the opening and closing of a hidden compartment in an automobile.  DOE then got out of the Target Vehicle with a bag and walked to an alleyway where he discarded a bag into the rubbish.  DOE then returned to the vehicle.

47.        At approximately 11:16 a.m., investigators observed a female exit 76 W. Newton Street and enter the Honda CRV.  DOE was the operator.    Investigators followed the vehicle to 18 Freeman Court, Lawrence MA where it arrived at 12:04 p.m.

48.        Investigators escorted the CS from the staging area to the meet location to await DOE's arrival.  Investigators observed the CS enter the restaurant at approximately 12:10 p.m.

49.        At approximately 12:21 p.m. investigators observed DOE and a female exit 18 Freeman Court and walk to the Honda CRV.  DOE removed what appeared to be a garbage bag from the back seat and give it to the female in his company.  DOE then departed in the Honda CRV and traveled to the restaurant in Lawrence.  Investigators observed DOE enter the restaurant at approximately 12:27 p.m.

50.        According to the CS, when DOE entered the restaurant he came to the table

where the CS was seated.  The CS went into the bathroom and took a video of the area inside which showed no drugs were present.  The CS returned to the table and upon doing so, DOE got up and entered the bathroom.   When DOE returned, he told CS to go to the bathroom and retrieve the drugs from behind the mop and place the money there.  CS stated that he/she re-entered the bathroom, found the mop on the bathroom wall and located the drugs behind the mop head.  The CS took the drugs and placed the money behind the mop head.  When the CS returned to the table, DOE re-entered the bathroom.  DOE exited the bathroom and returned to the table where the CS was seated.  DOE then engaged in a short conversation with the CS.  DOE told CS that his son was in Mexico but it was too dangerous to enter the United States.  DOE feared that if his son was apprehended by border patrol while trying to return to the United States he would be put in jail because he was previously deported.  DOE told the CS that his son would remain in Mexico and send the drugs to DOE in the United States.   DOE also indicated he was from Bani, Dominican Republic.   From my subsequent review of the recording from audio/video recording device provided to the CS, I was able to corroborate what the CS had told investigators regarding retrieving the drugs from the mop head in the bathroom and leaving the money where the drugs were found.  I additionally observed DOE travel to where the bathroom door was located.

51.     At approximately 12:49 p.m., investigators observed DOE exit the restaurant, enter the Honda CRV, and leave the area.

52.     At approximately 12:55 p.m. investigators observed CS leave the restaurant and surveilled CS to a prearranged location.  At that location, CS provided investigators with the recording device and a knotted clear plastic baggie that DOE left for the CS in the bathroom at the restaurant.  The knotted baggie contained two knotted baggies containing a chunk of a compressed substance wrapped in a napkin.  Investigators opened the bag and unwrapped the napkin to observe

14

each of the two knotted baggies to contain a chunk of white compressed powder.  A field test was conducted on the substance inside each bag.  The first bag tested positive for the presence of Valeryl Fentanyl and the second tested positive for the presence of Fentanyl.  CS and the CS's vehicle were searched again for contraband or unexplained currency, with negative results.

53.     In or about the week of September 6, 2021, DOE contacted CS telephonically, likely using WhatsApp.  This communication was unmonitored and unrecorded because CS was not expecting the call.  DOE wanted to make sure the CS was ok because CS has not contacted DOE to buy additional fentanyl.  At the direction of investigators, CS told DOE that CS would be ready to buy additional fentanyl the week of September 13.

54.     On September 14, 2021, at the direction of investigators, CS called DOE.  The call was recorded.  During the call, CS told DOE that CS was out of state but that when CS returned to the area he/she wanted to meet with DOE to buy more drugs.  DOE agreed to meet with CS when CS returned.

**September 14, 2021: Telephonic communication between CS and DOE**

55.     On or about September 14, 2021 at approximately 11:34 a.m., CS engaged in a telephone conversation with DOE over (347) 596-1155.  This conversation was recorded and monitored by investigators.  A review of the call was conducted by a Spanish Speaking law enforcement who informed this affiant that during the call, CS informed DOE that CS out of state and when CS returned to Massachusetts, CS would contact DOE to meet because CS needed to obtain more drugs.   DOE informed CS that he was heading to Lawrence.

56.     A review of the tracking device history for the Honda CRV revealed that it left left W Newton Street during the telephone call and traveled to Lawrence, Massachusetts

**DOE's identity**

15

57.      This affiant has reviewed the Criminal History of DOE (in the name L.M.) to include his NCIC/Interstate Identification Index record, commonly known as Triple I. Triple I is a national index of criminal histories maintained by the FBI. I have determined that two separate entries exist and each have their own FBI Number for the same name, date of birth, and social security number for the identity, L.M..  The Triple I system records every time that an individual is arrested and fingerprinted and assigns it a unique tracking number known as an FBI Number. The system combines entries based on fingerprints into a "rap sheet" based on the FBI Number, even if different names are entered. When the database receives a new entry of the fingerprints (that have not already been in the system), they create an entry that reflects the personal information given by the individual who is arrested, for example: name, date of birth, social security number, height, and weight. This entry creates a "rap sheet" that contains the information and the fingerprints. When the database receives a new entry with the same fingerprints and different personal information, the database will merge the information together with previous submissions. Conversely, when the system receives an entry of new fingerprints with the same biographical information as an existing entry, it will create a new entry. Since no two people have the same fingerprints, each FBI Number and "rap sheet" is unique to a particular individual.  The fact that two separate people had been arrested and fingerprinted using the personal identifying information that only one person should have indicates to this affiant that one is an imposter.  The two FBI numbers are as follows:

a.      FBI Number 202691AD1 – Target Subject DOE, under the name L.M.  This entry listed a date of birth xx/xx/1975, a social security number of xxx-xxx-5479, and a place of birth of Puerto Rico.  It described a male that is 5'8" tall and 260 pounds with brown eyes and black hair. It also lists a scar on his chin/face.  This entry reflects a criminal history in Massachusetts for drug

trafficking to include the 2016 drug arrest that this affiant participated in.

b.      FBI number 533530TC7 – Under the name L.M.  This entry listed a date of birth xx/xx/1975, and two social security numbers xx/xx/5479 and xx/xx/5979.  It described a male that is 5'7" tall and 135 pounds with brown eyes and black hair.  This entry reflects a criminal history in Puerto Rico beginning in 2007 to include burglary in 2009 and damage to property in 2018.  I obtained a copy of the Puerto Rico identification card for L.M. with date of birth xx/xx/1975 and Social Security number xxx-xx-5479 and observed the photograph to be of a different individual from DOE.

58.      I am aware that an American's citizen's biographical information (name, date of birth, social security number) can be fraudulently presented by an "imposter" to a government agency to obtain what would otherwise appear to be a valid identification.  Upon receipt of their fraudulently obtained driver's license, the "imposter" may now legally drive, register vehicles, travel by air, vote, receive state and federal benefits, be arrested, booked, and finger printed under their new assumed identity.  The purpose of stealing the identities is to deceive law enforcement during the arrest, booking, and prosecution, allowing their true identity to remain clean of any criminal history.   During this investigation, CS informed investigators that DOE is a Dominican National who traveled from the Dominican Republic to Puerto Rico where he obtained a Puerto Rican identity to enter the United States.  During the August 19, 2021 controlled buy described above, DOE stated he was a Dominican, originally from Bani.

**Drug Trafficker's Use of Cell Phones, Generally**

59.      From my training, experience, and information provided to me by other agents, I am aware that individuals frequently use cellphones to carry out, communicate about, and store records regarding their daily activities.  These tasks are frequently accomplished through sending

and receiving e-mail, instant messages, and other forms of phone or internet based messages; scheduling activities; keeping a calendar of activities; arranging travel; purchasing items; searching for information including information regarding travel and activities; arranging for travel, accessing personal accounts including banking information; paying for items; and creating and storing images and videos of their movements and activities.

60.     Based on my training, experience, and information provided by other law enforcement officers, I know that many smartphones can now function essentially as small computers.  Smartphones have capabilities that include serving as a wireless telephone, digital camera, portable media player, GPS navigation device, sending and receiving text messages, e-mails, and other electronic messages, and storing a vast range and amount of electronic data. Examining data stored on devices of this type can uncover, among other things, evidence that reveals or suggests who possessed or used the device.

61.     From my training, experience, and information provided to me by other agents, I am aware that individuals commonly store records of the type described in Attachment B in smartphones and other cellular telephones.

62.     Based upon my training and experience, and information provided to me by others involved in the forensic examination of computers, I know that electronic data on cellular telephones can be stored in a variety of methods, including, but not limited to, within the memory of the cellular telephone; within volatile memory, such as RAM; or on removable media, such as memory cards.  I also know that electronic data can often be recovered months or even years after it has been written, downloaded, saved, deleted, or viewed locally or over the internet.  This is true because:

        a.   Electronic files that have been downloaded to a storage medium can be stored

for years at little or no cost.  Furthermore, when users replace their electronic equipment, they can easily transfer the data from their old device to a new one.

b.  Even after files have been deleted, they can be recovered months or years later using forensic tools.  This is so because when a person "deletes" a file on a device, the data contained in the file often does not actually disappear; rather, that data remains on the storage medium until it is overwritten by new data, which might not occur for long periods of time.  In addition, the device's operating system may also keep a record of deleted data in a "swap" or "recovery" file.

c.  Wholly apart from user-generated files, electronic storage media often contains electronic evidence of how the device has been used, what it has been used for, and who has used it.  This evidence can take the form of operating system configurations, artifacts from operating system or application operation; file system data structures, and virtual memory "swap" or paging files.  It is technically possible to delete this information, but users typically do not erase or delete this evidence because special software is typically required for that task.

d.  Similarly, files that have been viewed over the Internet are sometimes automatically downloaded into a temporary Internet directory or "cache."  The browser on a cellular telephone often maintains a fixed amount of hard drive space devoted to these files, and the files are overwritten only as they are replaced with more recently viewed Internet pages or if a user takes steps to delete them.

## CONCLUSION

63.     Wherefore, there is probable cause to believe DOE has committed the Target Offense, and that evidence, fruits, and instrumentalities of the Target Offense, described in Attachment B will be located on the person of the Target Subject, described in Attachment A.


Respectfully submitted,

/s/ James Picardi

_____

James Picardi, Task Force Officer
Drug Enforcement Administration


Sworn to be telephone in accordance with Fed R. Crim. P. 4.1 this 15th day of September, 2021.


_____

Hon. M. Page Kelley
Chief United States Magistrate Judge

**ATTACHMENT A**

<u>Description of the Person to be Searched</u>

The "Target Subject" John DOE a.k.a. Luis Alberto MEDINA-FELICIANO (FBI Number

202691AD1).  The "Target Subject" is described as follows: a male Hispanic approximately 46

years of age, 5'6" in height and weighing approximately 208 pounds, black hair and brown eyes,

with a scar on the right side of his chin, utilizing a date of birth 08/25/1975, a SSN: 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,

and Massachusetts Driver's License S67093734.  The Target Subject is depicted below:






**ATTACHMENT B**

Description of the Items to be Seized

From January 1, 2020 through the present, evidence, fruits, and instrumentalities of violations of Title 21, United States Code, Sections 841(a)(1) (possession with intent to distribute and distribution of a controlled substance) and 846 (conspiracy to distribute and possess with intent to distribute a controlled substance) to be seized:

1. Controlled substances, including but not limited to fentanyl.

2. Books, records, receipts, notes, ledgers, and other papers relating to the purchase, storage, or distribution of controlled substances, including records of sales, records of purchases, log books, drug ledgers, personal telephone/address books containing the names of purchasers and suppliers of controlled substances, electronic organizers, telephone bills, bank and financial records, and storage records, such as storage locker receipts and safety deposit box rental records and keys.

3. Cash, currency, and currency counting machines, and records relating to controlled substances income and financial transactions relating to obtaining, transferring, laundering, concealing, or expending money or other items of value made or derived from trafficking in controlled substances.  Such items include, but are not limited to, jewelry; precious metals such as gold and silver; precious gems such as diamonds; titles; deeds; monetary notes; registrations; purchase or sales invoices; and bank records.

4. Documents or tangible evidence reflecting dominion, ownership, and/or control over any bank accounts, safe deposit boxes, stocks, bonds, mutual funds, and any other financial and/or monetary assets, instruments or interests, and over any tangible assets such as motor vehicles, real property, and commercial storage facilities, including any keys to motor vehicles, real property, or commercial storage facilities.

5. Photographs, videos, or other records concerning controlled substances, proceeds from the sales of controlled substances, or identities of coconspirators.

6. Cellular telephones belonging to or used by JOHN DOE a/k/a Luis Alberto MEDINA-FELICIANO, and all names, words, telephone numbers, email addresses, time/date information, messages or other electronic data relating to or referencing drug trafficking and/or referencing individuals engaged in drug trafficking, located in the memory of any mobile telephone, including but not limited to:

    a. Names and contact information that have been programmed into the device(s) (including but not limited to contacts lists) of individuals who may be engaged in drug trafficking;

b.   Logs of calls (including last numbers dialed, last calls received, time of calls, missed calls, and duration of calls) both to and from the device(s);

c.   Text messages both sent to and received from the device(s) (including any in draft form) relating to or referencing drug trafficking and/or referencing individuals engaged in drug trafficking;

d.   Incoming and outgoing voice mail messages both to and from the device(s) relating to or referencing drug trafficking or individuals engaged in drug trafficking;

e.   GPS data;

f.   Browser messages and/or internet communications (e.g., e-mail, text messages) both to and from the device(s) (including any in draft form) relating to or referencing drug trafficking or individuals engaged in drug trafficking;

g.   Documents, photographs, or videos in any format, including but not limited to Microsoft Word or Adobe PDF files, relating to or referencing drug trafficking or individuals engaged in drug trafficking;

h.   All data within the device(s) evidencing ownership, possession, custody, control, or use of the device(s); and

i.   Service provider handset unlock password(s) and any other passwords used to access the electronic data described above.

During the execution of the search of John DOE a.k.a. Luis Alberto MEDINA-FELICIANO described in Attachment A, law enforcement personnel are authorized to press the fingers (including thumbs) of DOE to the sensor of any cellular telephone and/or to hold the cellular telephone in front of his face